RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

DEREK KRAMER,

*Plaintiff-Appellant*,

*v.*

No. 24-3174

AMERICAN ELECTRIC POWER EXECUTIVE
SEVERANCE PLAN; AMERICAN ELECTRIC POWER
SERVICE CORPORATION,

*Defendants-Appellees*.

─────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:21-cv-05501—Sarah Daggett Morrison, Chief District Judge.

Argued: October 31, 2024

Decided and Filed: February 10, 2025

Before: COLE, MATHIS, and BLOOMEKATZ, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Tony C. Merry, LAW OFFICES OF TONY C. MERRY, LLC, Worthington, Ohio, for Appellant. Jason T. Gerken, PORTER, WRIGHT, MORRIS & ARTHUR, LLP, Columbus, Ohio, for Appellees. **ON BRIEF:** Tony C. Merry, LAW OFFICES OF TONY C. MERRY, LLC, Worthington, Ohio, for Appellant. Jason T. Gerken, PORTER, WRIGHT, MORRIS & ARTHUR, LLP, Columbus, Ohio, for Appellees. Christopher J. Rillo, BAKER BOTTS L.L.P., San Francisco, California, for Amicus Curiae.

─────────────

## OPINION

─────────────

MATHIS, Circuit Judge. This case looks like a standard claim under the Employee Retirement Income Security Act ("ERISA") to recover benefits. But Derek Kramer wants to

change the rules for these claims. Kramer believes he has a right to "full discovery," including documents subject to the attorney-client privilege, rather than an adjudication based on the administrative record. Kramer also thinks he has a constitutional right to a jury trial for his ERISA claim. And he seeks to apply a different standard to adjudicate his claim than the one we instructed district courts to use more than two decades ago. We reject Kramer's request to change the rules.

On the merits, Kramer has not shown that the district court erred in finding that the decision denying Kramer benefits was not arbitrary and capricious. We thus affirm.

## I.

In 2018, Kramer joined American Electric Power Service Corporation ("AEP") as the vice president and chief digital officer of AEP Charge, the company's new "innovation hub." R. 21–1, PageID 139. Almost a year after hiring him, AEP offered Kramer the option to participate in the AEP Executive Severance Plan (the "Plan"). He accepted. The Plan provides eligible employees a severance payment based on their base salary and performance "due to an Involuntary Termination or a Good Reason Resignation." *Id.* at 155.

In 2020, the company terminated Kramer's employment. Two events led to that decision.

First, during an annual audit, AEP's audit services department found that Kramer's executive assistant charged personal expenses to her company credit card in violation of corporate policy. Audit department representatives called Kramer to discuss the charges. Kramer followed up the same day to confirm that he spoke with his assistant and warned her about charging personal expenses to her company credit card. In the same audit the next year, the audit services department again flagged Kramer's assistant because she had the third highest charges on a company credit card, including excessive business expenditures and prohibited personal charges, all of which Kramer had approved. AEP suspended Kramer while investigating the charges.

The second event leading to Kramer's termination involved his company-issued cell phone. Per company policy and as part of the investigation of the credit-card charges,

AEP's region security coordinator, Kerrie Campbell, went to Kramer's home to retrieve his phone. Kramer hesitated to turn over the phone and asked if he could first make a call. Campbell agreed and waited on the porch while Kramer went inside. When he returned, Campbell asked for the phone and the PIN to unlock it, but Kramer hesitated again out of concern that AEP would be able to "see what [he had] on the phone," which he claimed he also used as a personal device. *Id.* at 202. After Campbell explained that the investigation might require looking at the phone, Kramer provided the PIN, and Campbell repeated the numbers out loud for confirmation. As she returned to her vehicle, Campbell discovered that the PIN Kramer provided was incomplete. She returned to the house and requested the PIN again, this time confirming that the phone unlocked. Following company procedure, she put the phone on airplane mode before leaving Kramer's home.

Campbell delivered the phone to AEP's security manager, Michael Knorps, who connected it to forensic software to transfer the data. During the extraction process, Knorps observed the device spontaneously "reboot[] and beg[i]n wiping itself clean." *Id.* at 182. Although he had significant information-technology and law-enforcement experience, Knorps had never seen this happen at AEP and suspected that Kramer had remotely wiped the phone. AEP contacted Kramer for an explanation, and he responded that he removed his personal Apple ID and iCloud account but did not intend to wipe the device. Based on further research, testing, and internal consulting, Knorps confirmed his suspicion that Kramer intentionally wiped the phone.

On October 2, 2020, AEP terminated Kramer. Kramer's direct supervisor informed him that the termination was based on Kramer's failure to tighten oversight of his assistant's expenses. The next month, Kramer submitted a formal claim for severance under the Plan.

In a January 19, 2021 letter, AEP's chief human resources officer Julius Cox denied Kramer's benefits claim, finding that the company terminated his employment "for Cause." *Id.* at 146. Under the Plan, a participant terminated for cause is ineligible to receive benefits.

The letter identified two bases for Cox's determination. First, Cox concluded that Kramer's violations of company policies on "proper expense account behavior" qualified as

"Cause" under § 2.5(v) of the Plan. *Id.* That section states that "Cause" includes "a material violation of any of the rules of conduct of behavior of any AEP System Company . . . following notice and a reasonable opportunity to cure[.]" *Id.* at 156–57. Second, Cox found that Kramer wiping his company cell phone while it was subject to investigation constituted cause under § 2.5(ii). That provision identifies "Cause" as "commission of an act of willful misconduct, fraud, embezzlement or dishonesty . . . in connection with the Employee's duties to any AEP System Company[.]" *Id.*

Kramer appealed the initial claim determination to the Plan's appeal committee. The committee agreed with Cox's findings and denied Kramer's appeal. In its letter issuing the decision, the committee identified specific evidence in the administrative record supporting each of Cox's findings.

Kramer brought an ERISA action against AEP and the Plan. He asserted claims for a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), and for interference under 29 U.S.C. § 1140. Kramer included a jury demand with his complaint. AEP and the Plan moved to strike Kramer's jury demand, and the district court granted the motion.

Kramer moved to conduct discovery beyond the administrative record (i.e., the record of proceedings before Cox and the appeal committee). Acknowledging that our precedent limits discovery in ERISA denial-of-benefits actions to procedural claims, Kramer argued that the Supreme Court had implicitly abrogated that precedent, and that regardless, the district court should allow discovery into his procedural allegations. The magistrate judge granted discovery into the alleged "conflict of interest or bias" in the administrative process but otherwise denied additional discovery. R. 24, PageID 309. Kramer did not object to the magistrate judge's order.

Although AEP and the Plan produced some documents in response to Kramer's discovery requests, it withheld nearly 300 documents based on the attorney-client privilege. Kramer moved to compel production, arguing that the fiduciary exception to the attorney-client privilege applied because of ERISA's fiduciary requirements. AEP and the Plan maintained that the Plan was not subject to fiduciary requirements because it was a "top hat" plan, as defined by ERISA.

The magistrate judge agreed with AEP and the Plan and denied Kramer's motion to compel. The district court overruled Kramer's objections to the magistrate judge's order.

AEP and the Plan then moved for summary judgment. The district court construed the motion as a motion for judgment on the administrative record. Applying an arbitrary-and-capricious standard of review, the district court found that both Cox and the committee offered a reasonable, evidence-based explanation for their conclusion that AEP terminated Kramer's employment for cause. Accordingly, the district court granted judgment in AEP and the Plan's favor. Kramer appeals only the district court's adjudication of his denial-of-benefits claim.

**II.**

On appeal, Kramer argues that the district court erred by: (1) limiting the scope of discovery for his ERISA denial-of-benefits claim; (2) striking Kramer's jury-trial demand; and (3) granting judgment to AEP and the Plan. We address each argument in turn.

**A.**

Kramer makes two discovery-related challenges. First, he argues that the district court erred in denying his motion to compel AEP and the Plan to produce certain documents that AEP and the Plan were subject to the attorney-client privilege. Second, he argues that he was entitled to "full discovery" on his ERISA denial-of-benefits claim.

We review the district court's discovery rulings "for an abuse of discretion." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 560 (6th Cir. 2013) (quotation omitted). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *State Farm Mut. Auto. Ins. Co. v. Angelo*, 95 F.4th 419, 429 (6th Cir. 2024) (quotation omitted).

**1.**

Kramer's first discovery challenge turns on whether he established an exception to AEP and the Plan's assertion of the attorney-client privilege to withhold production of certain documents. Kramer purports to rely on the fiduciary exception to the privilege.

In the context of common-law trusts, the fiduciary exception prohibits "a trustee who obtains legal advice related to" executing his fiduciary obligations "from asserting the attorney-client privilege against beneficiaries of the trust." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 167 (2011). In other words, the fiduciary exception "requires that when an attorney gives advice to a client acting as a fiduciary for third-party beneficiaries, that attorney owes the beneficiaries a duty of full disclosure." *Moss v. Unum Life Ins. Co.*, 495 F. App'x 583, 595 (6th Cir. 2012) (citing *Becher v. Long Island Lighting Co. (In re Long Island Lighting Co.)*, 129 F.3d 268, 272 (2d Cir. 1997)).

Trust law informs our "effort to interpret ERISA's fiduciary duties." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). Thus, in the ERISA context, a plan fiduciary "must make available to the beneficiary, upon request, any communications with an attorney that are intended to assist in the administration of the plan." *Moss*, 495 F. App'x at 595 (quoting *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 787 (7th Cir. 2005)).

The fiduciary exception to the attorney-client privilege does not apply to the Plan if the Plan is an executive deferred-compensation plan, commonly referred to as a top-hat plan. Congress exempts top-hat plans from ERISA's fiduciary requirements. 29 U.S.C. § 1101(a)(1); *Simpson v. Mead Corp.*, 187 F. App'x 481, 484 (6th Cir. 2006). ERISA defines a top-hat plan as an employee benefit plan that is "[1] unfunded and [2] is maintained by an employer primarily for the purpose of providing deferred compensation [3] for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). The parties do not dispute that the Plan is unfunded and that the Plan is for certain highly compensated employees. But does AEP maintain the Plan to provide deferred compensation? The answer to this question turns on the meaning of "deferred compensation."

ERISA does not define deferred compensation. When a statute does not define a term, "we give the term its ordinary meaning," *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 863 (6th Cir. 2022) (internal quotation marks omitted), using "the traditional tools of statutory construction," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024). Normally, "dictionaries are a good place to start" in determining a term's ordinary meaning. *United States v. Hill*, 963 F.3d 528, 532 (6th Cir. 2020) (quotation omitted). Black's Law Dictionary (12th ed.

2024) defines "deferred compensation" to mean (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs"; or (2) "[a]n employee's earnings that are taxed when received or distributed rather than when earned, such as contributions to a qualified pension or profit-sharing plan." And the Third Circuit has said that "[a] deferred compensation plan 'is an agreement by the employer to pay compensation to employees at a future date. The main purpose of the plan is to defer the payment of taxes.'" *Accardi v. IT Litig. Tr. (In re IT Grp., Inc.)*, 448 F.3d 661, 664 (3d Cir. 2006) (quoting David J. Cartano, *Taxation of Compensation & Benefits* § 20.01, at 709 (2004)). Indeed, several of our sister circuits have held that severance payments are a form of deferred compensation under ERISA's top-hat provision. *Duggan v. Hobbs*, 99 F.3d 307, 311–13 (9th Cir. 1996); *Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir. 1989); *Am. Int'l Grp., Inc. v. Guterman*, 496 F. App'x 149, 150–51 (2d Cir. 2012) (order). Thus, the Plan is a top-hat plan if AEP maintained it to pay compensation to participants, like Kramer, in the future.

The plain language of the Plan shows that AEP maintained it to provide deferred compensation. The Plan's benefits include a severance payment equal to the participant's annual base salary and maximum incentive bonus, immediate vesting of a portion of the participant's restricted stock units, and a prorated share of "performance unit" awards. R. 21–1, Page ID 164. Under the Plan's terms, AEP must pay those benefits—"to which a Participant is entitled" (i.e., as of the Plan's effective date)—according to a payment schedule. *Id.* at 165–66. The payment schedule provides that AEP shall pay 50% of the total amount as of the first regular payroll date that coincides with or immediately follows the day six months after the termination, and the remaining balance in 13 equal bi-weekly installments on the later regular payroll dates. A Plan participant can receive benefits only after he has resigned or been terminated, and at least one year will pass between the time they acquire the right to compensation and when the final installment becomes payable. Phrased differently, the Plan entitles participants to compensation that is or may be payable in a later year.

Kramer resists the conclusion that AEP maintained the Plan to provide deferred compensation. Relying on *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004), Kramer argues that we should look to Section 409A of the Internal Revenue

Code and related Treasury regulations to construe "deferred compensation."  We should do so, he contends, because "Congress' objective" in enacting ERISA "was to harmonize ERISA with longstanding tax provisions."  *See Raymond B. Yates*, 541 U.S. at 13.

The provisions that Kramer relies on do not help his cause.  First, Section 409A does not define deferred compensation.  Instead, that statute, as its title suggests, governs when an employee is taxed for deferred compensation under nonqualified deferred-compensation plans. 26 U.S.C. § 409A(a).  Second, the Treasury regulation that Kramer cites provides that "a nonqualified deferred compensation plan meets the requirements of section 409A(a)(4)(B) only if . . . the election to defer such compensation is made and becomes irrevocable not later than the latest date permitted in this paragraph."  26 C.F.R. § 1.409A-2(a)(1).  The statutory provision mentioned in the regulation describes requirements for when the initial deferral election must be made.  *See* 26 U.S.C § 409A(a)(4)(B).  But again, it does not define what a deferred-compensation plan is in the first place.  If anything, the relevant provision for defining "deferred compensation" might be Treasury Regulation § 1.404(b)-1T, which provides that a plan "defers the receipt of compensation" if an employee receives compensation "more than a brief period of time after the end of the employer's taxable year in which the services creating the right to such compensation or benefits are performed."  26 C.F.R. § 1.404(b)–1T; *see Duggan*, 99 F.3d at 311–12 (citing the same).  The plain terms of this provision suggest that the Plan defers compensation.

Kramer also argues that the Plan falls under an exception to deferred compensation in the Treasury regulations for some "separation pay plan[s]."  *See* 26 C.F.R. § 1.409A-1(b)(9)(iii). But regardless of whether the Plan would qualify as a "separation pay plan," those regulations apply only to § 409A of the Internal Revenue Code, not to ERISA's top-hat provision.  Although the definitions in the Code and corresponding regulations may be useful for interpreting some ERISA provisions, *see Raymond B. Yates*, 541 U.S. at 13–14, that does not mean ERISA incorporates the entire legislative and regulatory scheme of the Internal Revenue Code.  And even though the Plan provides that its terms are "intended to comply with the requirements of [§] 409A and its related regulations and guidance," R. 21–1, PageID 155, that language simply

expresses an intent to comply with the tax law. It does not establish (nor could it) that courts must read every Internal Revenue Code provision and Treasury regulation into ERISA.

Finally, Kramer argues we should avoid a broad interpretation of deferred compensation because it produces an absurd result—namely, that the term would mean something different under Title I of ERISA than it would under the Internal Revenue Code. But it is not absurd for the same term to have different meanings in different statutes. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 237–38 (2012) (explaining that the absurdity doctrine applies only if no reasonable person could intend the outcome and the error was obviously technical or ministerial).

Because the Plan qualifies as a top-hat plan, the fiduciary exception to the attorney-client privilege does not apply. As a result, the district court did not abuse its discretion in denying Kramer's motion to compel AEP and the Plan to produce privileged documents.

**2.**

Kramer has waived appellate review of his argument about his request for "full discovery." Kramer sought discovery beyond what was contained in the administrative record. The magistrate judge granted Kramer's request in part. Specifically, the magistrate judge allowed Kramer to obtain discovery into his allegations of bias and prejudice in the administrative process. Kramer did not object to the magistrate judge's order.

Because Kramer did not object to the magistrate judge's order, he may not challenge it on appeal. "A party may not assign as error a defect in the [magistrate judge's] order not timely objected to." Fed. R. Civ. P. 72(a). Although we may excuse Kramer's default in the interest of justice, *see Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 321 (6th Cir. 2015), Kramer has shown no injustice.

**B.**

Next, Kramer claims that he was entitled to a jury trial on his ERISA denial-of-benefits claim. He brought that claim under 29 U.S.C. § 1132(a)(1)(B). That provision allows "a participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms

of his plan." He asserts that the district court erred in striking his jury demand because the Seventh Amendment entitles him to a jury trial.

The Seventh Amendment preserves the right to a jury trial "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars[.]" U.S. Const. amend. VII. This jury-trial right applies only to "suits in which *legal* rights were to be ascertained and determined"; it does not extend to equitable claims seeking equitable remedies. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (quotation omitted). To determine whether the jury-trial right applies to a statutory cause of action, "we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Tull v. United States*, 481 U.S. 412, 417 (1987). And then "we examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* at 417–18.

We have held that ERISA claims for denial-of-benefits claims are equitable in nature. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998); *Bair v. Gen. Motors Corp.*, 895 F.2d 1094, 1096–97 (6th Cir. 1990). Thus, Kramer was not entitled to a jury trial on his ERISA claim.

Kramer's arguments to the contrary are unpersuasive. *First*, he argues that, because ERISA explicitly limits recovery to "equitable relief" in its other causes of action for plan participants but not in § 1132(a)(1)(B), this subpart must provide for legal relief. *See* 29 U.S.C. § 1132(a)(1)–(3). We have already rejected this argument. *See Bair*, 895 F.2d at 1096–97. And we are not alone in reaching this conclusion. *See Crews v. Cent. States, Se. & Sw. Areas Pension Fund*, 788 F.2d 332, 338 (6th Cir. 1986) (collecting cases).

*Second*, Kramer tries to read our prior holdings about the jury-trial right in ERISA denial-of-benefits cases as dicta. But in those cases, we consciously considered whether § 1132(a)(1)(B) claims are triable by a jury and concluded that they are not. *See Wright v. Spaulding*, 939 F.3d 695, 697 (6th Cir. 2019); *see, e.g.*, *Bair*, 895 F.2d at 1096–97. These are therefore holdings, and they are dispositive here.

*Finally*, Kramer argues that intervening Supreme Court precedent—namely, *CIGNA Corporation v. Amara*, 563 U.S. 421 (2011), and *Montanile v. Board of Trustees of National*

*Elevator Industry Health Benefit Plan*, 577 U.S. 136 (2016)—have implicitly abrogated these precedents. Neither case addresses jury trials, however, and *Montanile* interprets a different ERISA cause of action altogether. *See* 577 U.S. at 139 (discussing § 1132(a)(3)). As much as Kramer suggests these cases imply that § 1132(a)(1)(B) contemplates legal relief, undoing our precedent based on mere implication—and one that is not clear—would stretch *Amara* and *Montanile* too far. *See In re Smith*, 806 F. App'x 462, 464 (6th Cir. 2020) (per curiam) (holding that an intervening decision is not directly applicable if the pertinent issue "is not implicated by the question presented in [the intervening case], its holding, or its primary legal reasoning").

The district court did not err in striking Kramer's jury demand.

## C.

Finally, we consider the district court's decision granting judgment to AEP and the Plan on the merits of Kramer's denial-of-benefits claim. District courts review an ERISA denial-of-benefits claim de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan gives "the plan administrator such discretion, then a court must review the administrator's denial of benefits under the arbitrary-and-capricious standard." *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 546 (6th Cir. 2015) (citation omitted).

The Plan grants its administrator discretion to make eligibility determinations and to construe the Plan. Therefore, the district court correctly applied the arbitrary-and-capricious standard. That "standard is extremely deferential." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (quotation omitted). "[W]e review de novo the district court's finding that the administrator's denial was not arbitrary and capricious." *Shaw*, 795 F.3d at 547 (citation omitted).

Kramer has failed to show that the denial of benefits was arbitrary and capricious. An administrator's decision is not arbitrary or capricious "if it is the result of a deliberate, principled reasoning process[,] supported by substantial evidence," *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008) (quotation omitted), and "rational in light of the plan's

provisions," *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991) (quotation omitted). Section 7.4(d) of the Plan provides that the administrator must give written notice that: (i) provides the reasons for denial; (ii) references specific Plan provisions on which the determination was based; (iii) includes a statement that the claimant is entitled to receive relevant documents upon request; and (iv) states that the claimant has the right to bring an action under ERISA. Both the Plan administrator's letter denying Kramer's initial claim and the committee's letter denying his appeal provided such notice. And both letters provided substantial evidence in support of their finding that Kramer's termination was for cause under § 2.5 of the Plan. To show that Kramer violated company rules of conduct (§ 2.5(v)), the letters cited AEP's principles of business conduct, the annual audit reports revealing the expense account irregularities, and two affidavits corroborating repeated violations after a reasonable opportunity to cure. And to show that Kramer acted with willful dishonesty (§ 2.5(ii)), the letters relied on a report detailing the forensic testing performed on Kramer's company-issued phone and two affidavits attesting to his failure to cooperate with the investigation.

That Kramer disagrees with the administrator's findings does not make them arbitrary or capricious. *See Shields v. Reader's Dig. Ass'n*, 331 F.3d 536, 541 (6th Cir. 2003) ("When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." (quotation omitted)).

Kramer argues that the district court erred in four ways. None is persuasive.

*First*, Kramer argues that we should reverse the district court's decision because he did not receive the discovery to which he believes he was entitled. But, as we explained above, the district court did not err in denying Kramer's motion to compel AEP and the Plan to produce documents subject to the attorney-client privilege. And Kramer waived any challenge to the denial of his motion for full discovery.

*Second*, Kramer claims the district court violated the party-presentation principle by construing the dispositive motion as a motion for judgment on the administrative record, rather than a Rule 56 motion for summary judgment. Under the party-presentation principle, courts rely on the parties to frame the issues for decision and normally decide only the questions

presented. *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020). But the party-presentation principle is "supple, not ironclad," *id.* at 376, and courts sometimes can recharacterize motions to avoid an "inappropriately stringent application of formal labeling requirements," *id.* at 375 (quoting *Castro v. United States*, 540 U.S. 375, 381 (2003)).

This is one of those circumstances. In *Wilkins*, we rejected applying Rule 56 in ERISA denial-of-benefits actions because the summary-judgment standard is "designed to screen out cases not needing a full factual hearing," so "apply[ing] Rule 56 *after* a full factual hearing has already occurred before an ERISA administrator [would be] pointless." 150 F.3d at 619. The district court understood this and properly used the arbitrary-and-capricious standard rather than the Rule 56 standard. And consistent with *Wilkins*, the parties did not present, and the district court did not consider, any evidence beyond the administrative record. *See id.* Only the title—not the substance—of the dispositive motion indicated that AEP and the Plan moved for summary judgment under Rule 56. Thus, the district court's decision to construe AEP and the Plan's motion as a motion for judgment on the administrative record did not violate the party-presentation principle.

*Third*, Kramer argues that the district court should not have followed the procedures governing the review of denial-of-benefits claims that we adopted in *Wilkins* because, according to Kramer, the Supreme Court implicitly abrogated *Wilkins* in *United States v. Tsarnaev*, 595 U.S. 302 (2022).

In *Tsarnaev*, the Supreme Court considered whether the First Circuit's rules could cabin the discretion that district courts are entitled to when conducting jury selection under Supreme Court precedent. 595 U.S. at 312–13. The Court opined that lower courts cannot issue "supervisory" rules that conflict with a constitutional provision, federal statute, federal rule of procedure, or Supreme Court standards. *Id.* at 315–16. And it held that the First Circuit erred by "supplant[ing] the district court's broad discretion to manage *voir dire* by prescribing specific lines of questioning, and thereby circumvent[ing] a well-established standard of review." *Id.* at 317.

*Tsarnaev* did not supplant *Wilkins*. We are bound by *Wilkins* unless "the Supreme Court issues an intervening decision that is directly on point" or that "provides directly applicable legal reasoning" or "on-point dictum." *United States v. Fields*, 53 F.4th 1027, 1046–47 (6th Cir. 2022) (internal quotation marks omitted). *Tsarnaev* is not directly on point because it did not address ERISA. Moreover, in adopting procedures district courts must follow in adjudicating ERISA actions, *Wilkins* followed the reasoning from *Perry v. Simplicity Engineering*, 900 F.2d 963 (6th Cir. 1990). *See* 150 F.3d at 617–19. *Perry*, in turn, followed the relevant Supreme Court standard from *Firestone*. 900 F.2d at 965–66. Thus, any supervisory rules created in *Wilkins* were meant to comport with Supreme Court standards, which is in line with *Tsarnaev*. To the extent that *Tsarnaev* and *Firestone* are "in tension," as one of our colleagues has intimated, *Tranbarger v. Lincoln Life & Annuity Co. of N.Y.*, 68 F.4th 311, 322–23 (6th Cir. 2023) (Nalbandian, J., concurring), the Supreme Court, not this court, must resolve that tension. We must follow existing precedent.

*Fourth*, Kramer argues that he created a genuine dispute of fact that should have precluded summary judgment under Rule 56. Because Rule 56 does not apply to the adjudication of ERISA denial-of-benefits claims, this argument is meritless.

## III.

For these reasons, we **AFFIRM** the district court's judgment.